IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CARTWRIGHT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 05 C 0685 |
| | ) |
| JO ANNE B. BARNHART, | ) Wayne R. Andersen |
| Commissioner of Social Security, | ) District Judge |
| | ) |
| Defendant. | |

**MEMORANDUM, OPINION AND ORDER**

This case is before the Court on the parties' cross-motions for summary judgment. For the reasons stated below, the motion of plaintiff Asizlee Cartwright is denied, and the motion of defendant, Jo Anne Barnhart, the Commissioner of Social Security Administration, is granted.

**I. PROCEDURAL HISTORY**

Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security Administration ("SSA") regarding her application for disability insurance benefits. Plaintiff applied for disability insurance benefits on September 11, 2002, alleging that she became disabled on March 7, 2001. The SSA initially, and on reconsideration, denied plaintiff's application for disability insurance benefits. Plaintiff subsequently requested a hearing which an administrative law judge ("ALJ") conducted on April 1, 2004. On July 2, 2004, the ALJ issued his decision finding that, prior to January 2004, plaintiff could perform her past work, but, after that date, she could not do her past work and was disabled. The ALJ's decision became the final decision of the SSA when the Appeals Council denied review of that decision. Plaintiff now seeks judicial review from this Court as to whether the ALJ was correct in determining that she

was not disabled until January 22, 2004 and whether the ALJ erred in discounting plaintiff's testimony about her hand problems, her need to elevate her leg, and the side effects of medication.

## II. BACKGROUND

Plaintiff was 57 years old at the time of the hearing before the ALJ. Plaintiff attended college for two and half years and has taken additional college computer courses. Plaintiff worked for Lucent Technology as a technical associate from February 1978 until she was laid off as a result of down-sizing in March 2001. Thereafter, on November 16, 2001, plaintiff began a six-week training program at Check Free Corporation. Plaintiff alleges that she had to leave the training program after four weeks because she was in pain from constant sitting. On January 26, 2002, plaintiff went to work for H & R Block Tax Services as a receptionist. Plaintiff's job with H & R Block was seasonal and ended on April 15, 2002. Plaintiff has not worked since April 2002.

Plaintiff suffers from several medical problems including a history of breast cancer without evidence of recurrence, sinus problems and Type II diabetes which is under good control with medication and without evidence of end organ damage. Plaintiff also has a history of chest pain secondary to gastritis, arthritis in various places, mild osteopenia, and carpal tunnel syndrome. None of these medical conditions imposes any additional and significant limitation of function. For purposes of these motions, plaintiff's relevant medical history addresses two physical conditions: problems with her lower extremities, specifically her knees, and her upper extremities, in particular, her right hand. Plaintiff claims that she has been disabled since March 7, 2001 due to knee surgery, joint arthritis, and muscle weakness.

Plaintiff's medical problems with her lower extremities began when she fell in March

2

2001 and injured both knees. In August 2001, plaintiff underwent an arthroscopic debridement of the right knee. Medical records show that the surgery had positive results. On October 9, 2001, plaintiff reported that she was having some mild to moderate pain. As a result, on October 16, 23, and 30 of 2001, plaintiff was given Synvisc injections. Following these injections, plaintiff reported she was doing much better and had decreased pain, but still had some mild pain with weather changes. At a March 19, 2002 doctor's appointment, plaintiff complained of stiffness and weakness in the right thigh. Total knee replacement surgery was discussed at this time.

In May 2002, plaintiff reported that she was no longer receiving any relief from pain medication or other medical treatments and wanted to proceed with a total knee replacement. Plaintiff's treating specialist, Dr. Jefferey Picirillo, performed total knee replacement on June 5, 2002. Following the total knee replacement, medical records indicate that plaintiff was doing very well and was fully mobile. At an examination on August 27, 2002, plaintiff continued to show improvement and was walking with a single crutch. Medical evidence shows that plaintiff was given Vicodin and Bextra to ease the pain of resuming activity. In December 2002, plaintiff was released for full activities.

In January 2003, medical records show that plaintiff experienced some discomfort with weakness and had some difficulty getting up out of chairs. She also was using a cane at all times. A physical examination from January 2003 showed swelling in the right knee, but no other abnormalities about the extremities (including the hands). At an appointment in February 2003, plaintiff's physician noted that she continued to make good progress, and x-rays of her knee showed good position of the hardware.

In December 2003, plaintiff's physician prescribed a knee brace to alleviate limping and

3

pain. Medical records show that as of January 2004, with these measures, plaintiff could get along adequately. At the hearing, plaintiff testified before the ALJ that she would elevate her leg each day for about 50% of the day to alleviate swelling.

Also at issue in this appeal is plaintiff's relevant medical history dealing with hand pain. Plaintiff's medical records show that in November of 1998 she was wearing a wrist splint for carpal tunnel syndrome and she later underwent carpal tunnel syndrome release surgery.

In June 2002, during an appointment with her physician about her knee condition, plaintiff complained of arthritic problems with her right elbow and ankle. Medical records from this examination, although mainly focused on her knee conditions, stated that plaintiff may benefit from adaptive equipment to facilitate opening jars at home, which she reported to be difficult. Plaintiff's physician also noted she had arthritis with right hand weakness. No treatment was prescribed for plaintiff's hand complaints.

On January 10, 2002, while plaintiff was visiting her treating physician for her knee problems, an electromyogram ("EMG") and nerve conduction study also was performed to evaluate plaintiff's occasional hand problems. The January 2002 EMG study on plaintiff's hands was consistent with mild to moderately severe nerve conduction problems of the median nerve in both wrists and consistent with moderately severe bilateral carpal tunnel syndrome and also possible nerve conduction problems in both legs. Medical records subsequent to the EMG note the results as unremarkable.

In June 2002, during a visit to her rehabilitation specialist for her knee problems, plaintiff also complained about her arthritis in her right elbow and spasms in her right hand. Plaintiff stated that she was experiencing a reduction in right grip and progressive difficulty using her right hand. The rehabilitation specialist examined her right upper extremity and concluded that

4

she had generally functional strength in the right upper extremity but that her grip was reduced in her right hand more so than with her left hand. In July 2002, plaintiff returned to her treating rheumatology physician, Dr. Sosenko, and complained that her right fifth finger locked on occasion. In response to this complaint, Dr. Sosenko conducted a physical examination. Medical records show that physical examination indicated the patient had full muscle strength in her upper extremities.

On October 10, 2002, plaintiff reported to SSA that she had problems using her arms and hands. In November 2002, state agency physicians for the Disability Determination Services reviewed plaintiff's claim and concluded that she had residual functional capacity for sedentary work that would not require climbing ladders, ropes or scaffolds. The state physicians also concluded that plaintiff could not perform work that would require more than occasional climbing of ramps or stairs, balancing, stopping, kneeling, crouching or crawling, or more than frequent use of the hands for fine or gross manipulation. State agency physicians also found that plaintiff could occasionally lift/carry ten pounds and less than ten pounds frequently, stand/walk about six hours a day using an assistive hand-held device, and sit six hours a day.

In March 2003, plaintiff's ability to work was again assessed by state agency physicians from the Disability Determination Services. Reviewing physicians largely affirmed the November 2002 assessment, and plaintiff was again given the same limitations on her residual functional capacity for sedentary work.

At an examination on January 22, 2004, plaintiff reported recent problems with her right hand to Dr. Sosenko. Physical examination at this appointment showed tenderness of the metacarpal-phlangeal joint and right wrist as well as thickening of the flexor tendons. As a result of these findings, Dr. Sosenko referred plaintiff to hand specialist, Dr. Michael Cohen. On

March 18, 2004, Dr. Cohen diagnosed plaintiff with stenosing tenosynovitis involving the right index, right middle, and left index fingers and de Quervian's tenosynovitis involving the left wrist. In addition to seeing Dr. Cohen, plaintiff went to Midwest Hand Care from January 30, 2004 to April 14, 2004 for rehabilitative therapy. Records from the Midwest Hand Care Center indicate that the claimant had decreased symptoms following cortisone injections, but increased symptoms with increased functional hand use.

Based on the plaintiff's medical history and evidence presented at the hearing, the ALJ concluded that prior to January 22, 2004, plaintiff's problems were not severe and that she was not disabled up to that date. As of January 22, 2004, the ALJ found plaintiff to be disabled and entitled to disability insurance benefits.

## III. LEGAL STANDARDS

### 1. Standard of Review

Judicial review of the Commissioner's final decision is authorized by 42 U.S.C. § 405(g) and provides that the Commissioner's factual findings must be accepted as conclusive if such findings are supported by substantial evidence. *See Richardson v. Perales*, 402 U.S. 389, 399-401 (1971); *Powers v. Apfel*, 207 F.3d 431, 434 (7th Cir. 2000). "[A] mere scintilla of proof will not suffice to uphold the [ALJ's] findings; [however,] the standard of substantial evidence requires no more than 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (*quoting Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995)). Although the record is reviewed as a whole, a district court cannot substitute its judgment for that of the Commissioner by reevaluating the facts of re-weighing the evidence. *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995). Rather, a reviewing court is limited to the issues of whether the ALJ's findings are supported by substantial evidence

and whether the ALJ applied the correct legal standard. *Griffith v. Callahan*, 138 F.3d 1150, 1152 (7th Cir. 1999). A district court must affirm the ALJ's decision if it is reasonably drawn from the record and is supported by substantial evidence, even if some evidence may support the claimant's position. *Wolfe v. Shalala*, 997 F.2d 321, 236 (7th Cir. 1993). However, although great deference is given to the ALJ's determination, "courts must do more than merely rubber stamp the decision." *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 538 (7th Cir. 1992).

## II.   Statutory and Regulatory Framework

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. § 423(d)(1)(A). The Act further provides that an individual " shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that the is not only unable to do his pervious work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." *Id.* at § 423 (d)(2)(A) and § 13c(a)(3)(B)(1982 ed. and Supp. III).

In evaluating whether a person is disabled, courts are to use a five-step sequential evaluation processes established in the Social Security Act. *See* 20 CFR §§ 404.1520, 416.920 (1986). If the ALJ makes a dispositive finding at any step, he does not have to review further. *Id.* at 404.1520(a)(4), 416.920(a). The five steps are to be addressed by the ALJ in order: (1) Is

7

the claimant engaged in substantial gainful activity? (2) Is the claimant's impairment severe? (3) Does the impairment meet or medically equally equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant able to perform her former occupation? (5) Is the claimant able to perform any other work? *Id.* at §§ 404.1520(a)-(f), 416.920 (a)-(f). The claimant is entitled to disability benefits only if she satisfies each step set forth in the Act and the ALJ concludes that she is not able to perform other work. *Id.* at §§ 404.1520(f), 416.1920(a)(4)(v). *see also Bowen v. Yuckert*, 482 U.S. 137 (1987).

In making conclusions, an ALJ must "sufficiently articulate assessment of the evidence to assure us that considered the important evidence and . . . to enable us to trace the path of reasoning." *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999). In each case, an ALJ is required to build an "accurate and logical bridge from the evidence to [her] conclusion" in order for a reviewing to assess the agency's findings and provide a claimant with a meaningful review. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002).

### III. ANALYSIS

In the instant case, plaintiff argues that the ALJ wrongfully concluded that she had no severe impairment prior to January 22, 2004. Additionally, plaintiff argues that the ALJ was incorrect in discounting her testimony regarding her hand problems, her need to elevate her leg, and the side effects of medication.

#### 1. Substantial Evidence in the Record Supports the ALJ's Finding that Plaintiff Was Not Severely Disabled Prior to January 22, 2004.

In her decision, the ALJ considered plaintiff's application according to sequential evaluations identified above in 20 CFR §§ 404.1520 and 416.1920. The ALJ found that plaintiff's earnings showed that since the time of the alleged onset date of her disability, in some

years, plaintiff had substantial gainful activity while in others she did not. Because plaintiff was not engaged in substantial gainful activity for part of the relevant time period, the ALJ was required under the Social Security Act to proceed to the second question in the analysis. The ALJ determined that plaintiff had severe impairments, including status post right knee replacement, diabetes and obesity. Additionally, the ALJ found that plaintiff had a more recent severe impairment caused by stenosing tenosynovitis of the right index, right middle and left index fingers and de Quervain's tenosynovitis of the left wrist.

Because the ALJ found the impairment to be severe, the evaluation was required to move to the third step in the analysis in which the ALJ concluded that plaintiff's impairments were not equivalent to one of the listed impairments in the regulations. *See* 20 CFR §§ 404.1520(d), 416.920(d); 20 CFR pt. 404, subpt. P, App.1 (1986). As a result, the ALJ proceeded to the fourth step and found plaintiff's lower extremity impairment did not prevent her from performing past relevant work, but that her more recent hand condition would make her unable to perform her past relevant work. To reach this conclusion, the ALJ relied on the residual functional capacity assessments from the consultants to the Disability Determination Services. These state agency physicians found plaintiff to have residual functional capacity for sedentary work that would not require her to perform various climbing activities or more than frequent use of her hands. In addition, as a result of the more recent impairment to her hands, the ALJ added to the residual functional capacity assessment that plaintiff is not to perform work that that imposes manipulative restrictions on her hands. In considering her hand impairment, the ALJ found that plaintiff could not reasonably be expected to use the hands for more than occasional fine or gross manipulations, but, that this restriction only applied to the period beginning January 22, 2004. The ALJ determined that prior to January 22, 2004, medical evidence did not establish

that this impairment was severe.

The ALJ based her findings on medical records and evidence showing that, from the period of March 2001, the date plaintiff's disability allegedly began, through September 2003, plaintiff's medical records from her treating physician mention no complaints of hand pain or numbness or any diagnosis of a hand problem. Further, during a physical examination on July 24, 2003, plaintiff's hands were examined, and it was noted that there was no evidence of upper extremity symptoms of weakness. Based on the medical records, the ALJ reasonably concluded that plaintiff became disabled on January 22, 2004 because it was on this date that she reported to her physician having recent problems with her hands. Further, the records show that it was after her examination on January 22, 2004 that plaintiff was referred to a hand specialist who then diagnosed her with stenosing tenosynovitis. The ALJ concluded that a person with stenosing tenosynovitis will likely have increased symptoms with repetitive bending of the fingers, thumb and wrist, with gripping and with grasping. Therefore, the ALJ held that plaintiff was disabled after January 22, 2004. Previous to this date, however, the ALJ found there was no medical evidence to support a conclusion that plaintiff could not have used her hands for fine and gross manipulations. Based on the medical records and evidence presented at the hearing it was reasonable for the ALJ to conclude that plaintiff became disabled on January 22, 2004.

In reviewing the evidence presented regarding plaintiff's knee condition, the ALJ reasonably determined that plaintiff's knee condition did not prevent her from performing the work she had performed in the past. To reach this conclusion, the ALJ pointed to evidence that plaintiff's knee problem did not become debilitating until May 2002, nor was the particular impairment debilitating for a continuous period of 12 months. The ALJ explained that although the problem began in March 2001, plaintiff had good relief of pain following various medical

treatments including medication, injections and surgery. Further, plaintiff's stoppage of work during the relevant time was not due to her medical condition but rather a work lay off.

Particularly, the ALJ pointed to evidence from June 5, 2002 when plaintiff stated that she was not sure if she wanted to return to a job, or if she did, she would prefer part-time work. However, plaintiff did return to substantial gainful activity during the period of January through April 2002 at H & R Block. The termination of her employment was this time due to the seasonal nature of her work, not an inability to perform because of her alleged impairment. Further, plaintiff underwent total knee replacement surgery in June 2002 and obtained positive relief of her pain symptoms within six months of the replacement surgery. The ALJ agreed with the consultants to the Disability Determination Services that, given the totality of the circumstances, plaintiff was not disabled, but rather, limited to sedentary work that would not require climbing activities, balancing, stooping kneeling, crouching, or crawling. The ALJ added that plaintiff would need to alternate between sitting and standing every 30 minutes.

Finally, according to the regulations, because the ALJ found plaintiff to be disabled in regard to her hand condition, the ALJ was required to determine whether plaintiff is able to perform other work in light of her age, education, and work experience. Under this analysis, a claimant is entitled to disability benefits only if she is not able to perform other work. 20 CFR §§ 404.1520(f), 416.920(f). To reach this determination, the ALJ considered the testimony of the vocational expert.

At the April 2004 hearing, the vocational expert testified that, in relying on plaintiff's residual functional capacity assessment and her background, her work experience was comparable to a technical assistant, software support clerk or receptionist. The vocational expert concluded that plaintiff could perform her past work, or comparable positions, even with the

11

sit/stand requirements every 30 minutes but that plaintiff could not perform this work if she needed to elevate her legs.

In addressing the leg elevation issue, the ALJ concluded that because none of the medical evidence presented suggested that plaintiff needed to elevate her legs, the limitation was not applicable. At the hearing, plaintiff testified that several physicians had told her to keep it elevated. However, there is no medical evidence indicating that elevation was prescribed. In regard to her hands, the vocational expert testified that plaintiff could not perform her past work if she had limited use of the upper extremities, but could perform work as an information clerk if her hand use was limited.

At the hearing, the ALJ considered the testimony of the vocational expert, along with the more recent findings regarding plaintiff's hand impairment, and concluded that medical records prior to January 22, 2004 did not support a conclusion that plaintiff suffered impairment in the use of her hands for frequent fine and gross manipulations, but that after January 22, 2004, plaintiff suffered a debilitating impairment. Therefore, the ALJ concluded that plaintiff was entitled to disability benefits as of January 22, 2004. Based on the medical records and evidence at the hearing, it was reasonable for the ALJ to reach this conclusion.

In proceeding to the fifth step of the statutory analysis, because the SSA could not prove that there were other jobs existing in significant numbers in the national economy of which plaintiff could perform, the ALJ held plaintiff to be disabled as of January 22, 2004 and entitled to disability insurance benefits, since that date, but not prior thereto.

### 2. The ALJ was Correct in Disregarding Plaintiff's Testimony As To Medication Side Effects.

Plaintiff also alleges that the ALJ erred in disregarding her testimony as to medication

side effects without explaining why her testimony was rejected. In making this claim, plaintiff refers to her testimony at the hearing addressing alleged side effects that she suffers from her medication. Plaintiff is correct that an, "ALJ may not ignore an entire line of evidence that is contrary to her findings." *Henderson v. Apfel*, 179 F.3d 507, 514 (7th Cir. 1999). However, the ALJ is not required to discuss every piece of evidence. *See Manney v. Barnhart*, 320 F.Supp.2d 681, 694 (*quoting Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir.2001)).

In the instant case, the medication side effect line of questioning comprised only four questions at the hearing. These questions and answers merely established that plaintiff occasionally experienced side-effects from the medication that sometimes cause her to have trouble focusing on things. During this part of the hearing, plaintiff presented no medical evidence through medical records or physician testimony to substantiate this claim. The brief mention of occasional medication side effects with no significant testimony or corroboration from medical records did not establish important evidence that the ALJ was required to discuss in her opinion. It has been repeatedly held by the Seventh Circuit that an ALJ is not required to evaluate every piece of evidence or testimony presented in her decision, but rather, the important evidence needed to provide the reviewing court an understanding of her reasoning. *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993)(per curiam)*(citing Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir. 1984)). Thus, it was reasonable for the ALJ to not give plaintiff's testimony significant weight, if any.

## CONCLUSION

For the foregoing reasons, plaintiff Asizlee Cartwright's motion for summary judgment is denied, and defendant Commissioner Barnhart's motion for summary judgment is granted. This is a final and appealable order, terminating the case.

13

It is so ordered.

*Wayne R. Andersen*
Wayne R. Andersen
United States District Court

Dated: *November 17, 2005*